### DILLON *v.* STATE.

4745              261 S. W. 2d 269

Opinion delivered October 5, 1953.

Rehearing denied November 2, 1953.

---

[1] 43 C. J. S., Infants, Sec. 13.

436

*House, Moses & Holmes* and *E. B. Dillon, Jr.,* for appellant.

*Tom Gentry,* Attorney General and *Thorp Thomas,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, Chief Justice. The appeal questions two judgments. One sentenced the defendant to a term of seven years in the penitentiary for burglary, the other to seventeen years for grand larceny.

Although the motion assigns as errors thirty-seven trial transactions and matters occurring after the arrest was made and prior to arraignment, emphasis here relates to but six: (1) A mistrial should have been declared because of inflammatory remarks by prosecuting attorneys in their opening remarks and in the closing arguments; (2) the state was permitted to cross-examine the defendant's wife on matters not brought out on direct testimony; (3) undue stress on a previous conviction was permitted and the state was allowed through innuendo to suggest that the defendant was falsifying when he

denied other convictions; (4) hearsay evidence was prejudicial; (5) alleged admissions by the defendant were improperly admitted, and, (6) the verdict was contrary to the law and the evidence to such an extent that appellant's demurrer and motion for a directed verdict when the state rested should have been sustained.

Dillon was convicted on charges that he broke into H. L. Gipson's garage and implement building at Harrison. The defendant is a citizen of Oklahoma residing at Tulsa where he operated and owned a garage and wheel-aligning business. He also owned a small sawmill near Highway 66 about twelve miles from Tulsa.

Gipson testified that at approximately 2 :15 the morning of June 18, 1952, the garage was broken into. Five guns, a chain saw, a Clinton motor, and about $23,000 in money were taken. Gipson communicated with the manufacturers of the saw and received the company's coöperation in locating it, identification having been made through the serial number. Shortly after contacting the manufacturer information was received that the saw was at Dillon's mill near Tulsa. With this knowledge Gipson went to Oklahoma, accompanied by Sheriff Roy Johnson of Boone County, Deputy Haskell Sitton, and another officer. Gipson said that the mill was about a mile from the main highway and could not be seen from it; nor was there any sign calling attention to the intersection, or lateral. The saw was found in an old car, chained to another saw, and locked. This occurred on Saturday and Dillon was arrested the following Monday.

After being brought to Arkansas Dillon told Gipson that he bought the saw from a stranger and had a receipt for it. At one time Dillon said that a man known as John Kennedy was present when the saw was purchased, but later this contention was abandoned. According to Gipson's testimony Dillon stated that he could get up $15,000 personally, and in addition would execute a deed to some property "to help settle the deal". Finally, Dillon proposed taking Gipson "to those other boys". In this connection Gipson testified: "He said he could tell

who they were; that they wouldn't talk to the officers, but that they would talk to him. He said, 'I can take you to them [and] they will do what I am telling you. My wife can go with you' ''. Dillon is also quoted as having said that two cars had been bought—worth $5,000—but ''they'' would have to sell them and it would take some time to get ''this stuff'' together.

Over defendant's objections Gipson was permitted to testify that one of the items stolen from his garage was a Clinton three-horse power gasoline motor. In Dillon's possession certain keys were found. These were taken by the officers who returned to Oklahoma and ascertained that one fitted a cabin at Langley, Okla., owned by the defendant, who on cross-examination admitted that the serial number was not on the motor. He explained that in transporting it by automobile the ''deck lid'' got hung and tore the plate partly off. The detached part was kept for future use if it became necessary to order parts. Dillon insisted that the motor was detached from his lawn mower and that he sometimes used it to drive a cement mixer.

There was testimony that the motor taken from Gipson's garage had been stuffed with paper where the dip-stick was ordinarily inserted. The motor found in defendant's cabin did not have a dip-stick, and the point of entry was stuffed with paper identified by Gipson as being similar to the paper he had put in the stolen motor.

Dillon's principal defense was an alibi. He was supported by Mrs. Dillon and by a friend who was positive that the defendant was at home the entire night of June 18th. Against these statements and Dillon's assertion that he had been in Harrison but once—two or three years ago while on his way to Norfork—was testimony that he was in Harrison June 16th.

*First.*—It is urged that a mistrial should have been declared (a) because of inflammatory remarks by a state representative in his opening statement, and (b) when special counsel referred to an ''Oklahoma Gang,'' to

thieves and thugs. We fully agree with counsel for appellant that a courtroom should not be used as a forum where a lawyer engaged in a criminal prosecution may with impunity assail a defendant or his witnesses, and no doubt the border line of impropriety was almost reached. But the trial court commented that if testimony upon which the opening statements were made should be held inadmissible the jury would be properly admonished. We find nothing in the opening statement to which specific objections were made that would have warranted the court in acting upon the defendant's suggestions.

Testimony introduced by the state showed that Dillon was allowed to telephone from Harrison to a friend in Tulsa. Dillon said that he kept a pack of hounds for use in hunting wolves; that these dogs were in a pen and he feared they would go hungry, so he asked this friend to see that his "shotgun dogs" were fed. It is claimed by the state that the request was repeated, the inference being that "shotgun" was emphasized. The guns stolen from Gipson's garage were not found. Mr. Henley, in referring to the defendant's allegation that he was threatened by one of the officers, said: "At the very time when these threats were supposed to have been made, what was he doing? Sitting in the sheriff's office calling one of his brother thugs in Tulsa. . . ."

The record does not disclose an objection at the time the statement was made, but at the close of Henley's address one of the defendant's attorneys asked for a mistrial "by reason of the prejudicial statements in the argument—and we particularly want to object to the prejudicial and inflammatory reference to this defendant and his associates as thugs."[1] From a strictly technical standpoint the protesting attorney's request for a mistrial was predicated upon what he termed "prejudicial statements in the arguments of the attorneys for the state." This was followed by an "objection" to use of the

---

[1] One of Webster's definitions of thug is: A member of a former confederacy or fraternity of northern India, worshipers of Kali, in whose honor murder, usually by strangling, was made a profession, the members of the fraternity deriving their main support from plunder thus secured. They were suppressed by the British, 1830-40.

word thug. But assuming that the entire range of argument by the state was intended in the motion for a mistrial, we must reject the assignment because if the state's testimony were true (and certainly it was substantial) the expression was nothing more than a vigorous method of denominating the defendant and those presumptively associated with him.

Mr. Holt in his argument urged that the defendant be convicted. When objection was made the Court's admonition was: "The jury's attention is called to two statements made by counsel for the state. Mr. Henley referred to the defendant as a thug. The other statement [made by Mr. Holt] was that you ought to send the defendant to the penitentiary where he belongs. You are admonished that these are only statements of opinion of the attorneys, and they are not to be considered by you as evidence."

*Second.*—Frances Dillon, the defendant's wife, was called by him as a witness. She was not asked regarding the gasoline motor and certain other matters. However, the cross-examination had proceeded to a point covering five typewritten pages before an objection was interposed. This objection was that "there have not been more than one or two questions within the scope of the direct examination, [hence] the balance would be outside the scope of cross-examination." The objection was overruled. After further testimony had been given the following appeal to the court was made by one of the defendant's attorneys:

"At the conclusion of the cross-examination of this witness the defendant objects to the question and testimony adduced thereby with reference to all those questions outside the examination in chief, including the last series of questions, which are obviously intended solely to discredit the witness, and having no connection with the case, and no connection with the examination of this witness in chief." The motion was overruled and exceptions saved.

We agree that where, as here, the witness was the defendant's wife and therefore could not be called to testify against him, the state could not do by indirection what it could not do directly. We have also held that where the relationship does not exist the right of cross-examination should be confined to those facts and circumstances connected with the matters stated in the direct examination of such witness. The rule is different where the cross-examiner makes the witness his own. *St. Louis, I. M. & S. Ry. Co.* v. *Raines,* 90 Ark. 398, 119 S. W. 665. A later case is *Cook* v. *State,* 162 Ark. 205, 258 S. W. 136.

This rule, however, does not help appellant. His objections were not specific, and were not made when the testimony was given. It is not enough to say that "I object to all of the questions asked this witness except one or two." The trial court has a right to have attention specifically directed to the vice at the time it occurs in order to more correctly direct the trend of an examination.

*Third—Prior Convictions.*—Appellant admitted that he had been convicted of stealing an automobile in 1934. The present trial occurred in March, 1953, and appellant was then 36 years of age. He was therefore 19 in 1934. It is objected that counsel for the state, while interrogating the witness regarding other crimes or convictions, held a sheet of paper to which the attorney ostensibly referred while repeating the inquiries. Appellant thinks the effect of this procedure was to leave with the jury the impression that records of other convictions were at hand and that when negative replies were given they were untrue. Following preliminary legal skirmishes and the court's action in sustaining the defendant's objection to the form in which questions were being asked, there was this colloquy:

Question: "Since November 1, 1934, until the present time, how many times have you been convicted of grand larceny or a felony?" Answer: "One time, when I was a juvenile—in 1934". Comment by counsel for the state: "Your honor, in fairness to this witness I think

somebody ought to take him out behind the barn and tell him what a felony is. We think he has been convicted three times, and if he stands here and testifies he has been convicted one time, I want to seek an information for perjury''. Immediately following this declaration there appears in parenthesis the following: ''After private conferences between court and attorneys''. It is not clear, therefore, whether the comment it is now claimed was prejudicial was made in the jury's hearing. The next question to which exception was taken was answered before an objection was interposed. A little later the paper from which counsel for the state was assumed to be reading was explained by one of appellant's attorneys in this way:

''We object to counsel continuing this. [Mr. Holt] has a sheet there and it has on its face the conviction of Dillon when he was a boy, when he was admitted; and the second entry is when he was committed to the reformatory for the first offense; the third entry is an entry [showing] his arrest. This question about Hutchinson (Kansas) on the sheet—it says 'S. I. P.,' which is an abbreviation meaning where he was committed to the reformatory''.

The court directed the jury to consider the felony convictions ''and other acts'' only for the purpose of testing credibility of the witness.

It was said in *McCoy* v. *State,* 46 Ark. 141, and cited with approval in *Fielder* v. *State,* 206 Ark. 511, 176 S. W. 2d 233, that when an appellant voluntarily takes the stand as a witness in his own behalf he is subject to the same cross-examination to which any other witness might be subjected, and it is not improper to ask him if he has served a term in the penitentiary, and if so, upon what charge. The testimony, of course, has nothing to do with the guilt or innocence of the defendant respecting the crime with which he is presently accused; but where, as here, the defense is an alibi, coupled with long explanations of transactions in respect of which his testimony and that of others sharply conflict, any reasonable test

directed to the defendant's willingness to swear falsely may be applied, and we have consistently held that inquiries regarding former crimes or convictions are in that category.

*Fourth—Hearsay Evidence.*—We do not find in the record anything of a substantial nature based entirely upon hearsay to which objection was made in a timely manner that could have prejudiced the defendant's cause.

*Fifth—Appellant's Admissions.*—The state contended that Dillon had recently acquired certain valuable property, including an airplane, a motor boat, automobiles, and that he had spent money improving his home. Contra, it was asserted that the boat and airplane were bought before June 18th. Sheriff Johnson was asked if he knew the condition of appellant's cabin when a search was made on Tuesday. The officer described the extreme disorder of the interior and the objection was made that the question was prejudicial "unless the witness states that he personally saw the breaking and entering". The sheriff had said that when he reached the premises he learned that the ransacking had occurred "on Monday about midnight". When it is considered that reasonable inferences were deducible from admissions or declarations made by the defendant, we do not think the officer's testimony and Dillon's statements were erroneously introduced. Counsel takes the position that appellant's proposals, if actually made, were in the nature of a compromise, and these attorneys contend that evidence of compromise proposals is inadmissible. *Hinton* v. *Brown*, 174 Ark. 1025, 298 S. W. 198. The rule ordinarily applies to civil litigation, as the cases in this state relied upon for support will disclose. Where reasonable minds would agree from statements voluntarily made by the accused that his references to the stolen property tended to tie him to the felony, such evidence is not open to the objection that a compromise is involved.

*Sixth—Sufficiency of the Evidence.*—Credibility of witnesses was a matter for the jury. On appeal we determine only whether the testimony on the whole case

was substantial. The jury was instructed not to convict the accused unless his guilt had been established beyond a reasonable doubt. It was the trial court's duty to set the verdict aside unless convinced that the jury had not erred in weighing the evidence. Here the test is substantiality, and we cannot say that this essential is lacking.

Affirmed.

Mr. Justice HOLT not participating. Mr. Justice ROBINSON dissents.